## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### Southern Division at London

| | | |
|---|---|---|
| **BRIDGETT DINTER;** | ) | |
| | ) | |
| *Plaintiff*; | ) | |
| | ) | |
| *v.* | ) | **No. 6:22-cv-157-CHB-HAI** |
| | ) | |
| **ROK MIREMAMI;** | ) | |
| | ) | |
| *Defendant.* | ) | |

## MOTION AND MEMORANDUM FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.     INTRODUCTION

The Plaintiff, Bridgett Dinter, hereby seeks emergency injunctive relief to prevent the Defendant, Rok Miremami, from taking action to evict her on the basis of unlawful discrimination against a person with a disability.  The Court should issue a temporary restraining order to preserve the status quo and prevent any action by the Defendant that could result in Ms. Dinter being displaced from her home.

## II.     FACTS

1. Bridgett Dinter is a tenant of Rok Miremami, having entered a year-to-year lease with him beginning August 1, 2020. It was renewed once for the period between August 1, 2021 and July 31, 2022. A copy of the original lease is attached as Exhibit 1.

2. Ms. Dinter has severe diabetes and recently learned of the opportunity to have a diabetes service dog. Such service dogs are specially trained for diabetic

1

owners who are at risk of adverse blood sugar incidents. They use their sense of smell to alert a diabetic person, or person around them, if their owner's blood sugar gets too high or too low (for example, at night). The owner can then take appropriate action to avoid hyper- or hypoglycemia, a dangerous situation that can result in death.

3. In late April 2022, Ms. Dinter asked her landlord for an accommodation to allow for a diabetes service dog. Her request was prompted by advice from her doctor that she has nocturnal hypoglycemia which she does not consistently detect by herself, preventing her from taking appropriate mitigating actions. When she requested the service dog, the property manager said no. Later, the property manager told Ms. Dinter that she could not have a service dog, as it was against their policies (although the opposite is stated in the lease),[1] and furthermore that they had elected not to renew her lease instead. Ms. Dinter received a notice of non-renewal on or about June 14, 2022. A copy of the notice that Rok Miremami would not be renewing the lease is attached as Exhibit 2.

4. On or about June 30, 2022, Ms. Dinter again asked for renewal of her lease and to be permitted to have a diabetes service dog based on the language in the lease. The apartment manager declined the request again. The property manager said, "The law is that it has to be one of PTSD" and that "Rok brought a bunch of paperwork in." Ms. Dinter asked about the reference to PTSD and

---

[1] "Our property gladly allows Assistance Animals as an accommodation for qualified tenants with disabilities." Ex. 1, at 5.

the property manager said, "like for the vets and stuff where they have to have their animals for the PTSD." When Ms. Dinter asked, "Is there any way possible for me to renew my lease and can I have my service dog?" the property manager answered, "No, we've already sent you the letter notice that we're not going to be renewing the lease and it had come from Rok, it didn't come from me, it come from Rok, and I have to.   And you know he's the one that pays my salary, so there's truly not much I can do." When Ms. Dinter expressed her worry about where she would live and said, "I just don't know what I'm going to do," the property manager said, "It's hard to find places right now, it really is. I mean if I knew of anything. . ." Ms. Dinter recorded this conversation. A CD of the recording (Exhibit 7) will be submitted to the Court as a conventional filing.      A      link      to      it      is      available      at https://www.youtube.com/watch?v=zgifyr1zjMM.

5.  Ms. Dinter contacted Lexington Fair Housing Council for assistance in formally making her service dog request. On or about July 26, 2022, Lexington Fair Housing Council sent Rok Miremami a reasonable accommodation request letter, spelling out the provisions of federal and state law that he would violate if he refused to allow her to have a diabetes service dog. A copy of this reasonable accommodation request letter is attached as Exhibit 3.

6.  To further support her legal right to a service dog, Ms. Dinter provided the property manager with a doctor's note. A copy of the doctor's note is attached as Exhibit 4.

3

7. Rok Miremami responded by claiming that he declined to renew her lease because she had supposedly said that she could not afford an increase in the rent from $750 per month to $850. This assertion was inaccurate as Ms. Dinter had merely quibbled about the rent increase. This false assertion that Ms. Dinter had indicated an inability to afford the increased rent represents a sudden change—after Lexington Fair Housing Council's reasonable accommodation letter—in Mr. Miremami's explanation for why he declined to renew the lease. The rent increase issue was never previously stated to be even a contributing factor to the non-renewal. Contrary to this assertion, Ms. Dinter consistently maintained her request to renew her lease and to obtain an accommodation to have a service dog. A copy of Mr. Miremami's written response to Lexington Fair Housing Council is attached as Exhibit 5.

8. On August 26, 2022, Mr. Miremami had a "Kentucky Notice to Vacate" served on Ms. Dinter, giving her fifteen days to leave and saying, "Failure to vacate premises may result in legal action"—i.e., presumably an eviction. A copy of this notice to vacate is attached as Exhibit 6.

9. To date, Mr. Miremami has refused to allow a reasonable accommodation for Ms. Dinter to have a service dog and has refused to renew her lease. Ms. Dinter has every reason to believe that Mr. Miremami will file an eviction action in Pulaski District Court on or very shortly after September 11, 2022. Under Kentucky eviction law, a case can move from a complaint to a judgment in less than a week. *See Baker v. Ryan*, 967 S.W.2d 591, 593 (Ky. App. 1997) ("In

4

Kentucky, a district court can hold trial in such a case as early as three days after service of the warrant notifying the tenant of the action.").

10. As Ms. Dinter's affidavit at Exhibit 8 explains, she does not have another place of her own to move if she becomes subject to such an action. She believes that her adult autistic son would not appropriately handle such a sudden change, and that she and her son would be severely harmed if Mr. Miremami is permitted to violate her rights.

11. Ms. Dinter has made continuing efforts to resolve this matter outside of court. To the extent that the Defendant has been reachable, he and his employees have expressly refused requests to resolve this matter. *See* Certificate of Efforts, *infra*. Although return of service to the Defendant has not yet been filed in this action, the Defendant was served by Lexington Fair Housing Council with Ms. Dinter's formal reasonable accommodation request and this action or motion should not come as a surprise to the Defendant. The Defendant has been given numerous opportunities to correct his unlawful actions without judicial intervention but has declined to do so.

### III.   ARGUMENT

The Court should preserve the status quo and enjoin Mr. Miremami from taking any further action in violation of federal and state fair housing laws.  As described below, Ms. Dinter satisfies the standard for a temporary restraining order.  Given the quick pace that Kentucky's eviction laws proceed at, an emergency injunction is warranted to preserve Ms. Dinter's and her son's housing and health.

## A. Standard for issuing a Temporary Restraining Order

The Court can grant a Temporary Restraining Order and Preliminary Injunction in order to preserve the status quo and protect the moving party from irreparable harm. The factors for the Court to determine whether to grant a Temporary Restraining Order are "1) whether the applicant has demonstrated a likelihood of success on the merits; 2) whether the applicant will be irreparably injured absent a stay; 3) whether issuance of the stay will substantially injure the other interested parties; and 4) where the public interest lies." *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

## B. Ms. Dinter is likely to succeed on the merits.

Ms. Dinter is likely to prevail on the merits of this action because she has presented substantial evidence of discrimination and the applicable statutes clearly provide for the relief she requests.

### 1. Ms. Dinter presents substantial evidence of discrimination.

Ms. Dinter's evidence of discrimination includes an audio recording of the Defendant's property manager expressly rejecting her request for a service dog and for her request for the lease to be renewed.[2]

---

[2] The statements of the property manager are admissible non-hearsay as a statement of an employee of a party opponent on matters within the scope of her employment. FRE 801(d)(2)(D).

6

When Ms. Dinter explained to the property manager that the lease stated that assistance animals were allowed, the apartment manager expressly rejected her request and informed her that this was limited to veterans with PTSD. *Exhibit 7* at 0:32 to 1:12. Additionally, Ms. Dinter's Affidavit is unequivocal that the apartment manager initially told her that the reason for non-renewal was because she had requested a service animal. *See Exhibit 8* at 2 ("[S]he told me again that I could not have a service dog and that they would decline to renew my lease instead of allowing me to have a service dog.") Finally, the extent to which Mr. Miremami has changed his story on his reason for non-renewal indicates an intent to discriminate. *Compare Exhibit 7* (stating that Mr. Miremami only allows service dogs for veterans with PTSD) and *Exhibit 5* (falsely stating that Mr. Miremami allows service animals). With these inconsistent statements to Ms. Dinter and to the Lexington Fair Housing Council, Mr. Miremami tried to trick Ms. Dinter into believing that she did not have the rights she sought to exercise, and then tried to deny his blatant violation of her rights once he was confronted with someone likely to be knowledgeable in the law.

**2. The law clearly provides for the relief that Ms. Dinter requests.**

Both federal and state law provide injunctive relief for a person experiencing housing discrimination. Specifically, the law authorizes the Court to issue "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)," if it finds that "a discriminatory housing practice has occurred or is about to occur." 42 U.S.C.

§ 3613(c)(1). Kentucky state law similarly states that persons suffering from housing discrimination "have a civil cause of action. . .  to enjoin further violations." KRS 344.450.

Furthermore, the conduct demonstrated by Ms. Dinter's Affidavit and evidence unambiguously violates state and federal antidiscrimination law. Under the Fair Housing Act, discriminatory housing practices are defined to include refusing to make reasonable accommodations that are necessary for equal housing opportunity to handicapped persons. 42 U.S.C. § 3604(f)(3)(B). HUD's notice-and-comment regulations use service animals as an explicit example for when accommodations are necessary, *see* 24 C.F.R. § 100.204, and HUD guidance provides additional clarity, *see* HUD, Office of Fair Housing and Equal Opportunity, No. FHEO-2020-01, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* (2020).[3] Under Kentucky law, it likewise constitutes unlawful housing discrimination to refuse to make reasonable accommodations to allow a disabled person to have equal housing opportunity. KRS 344.360(11). Kentucky law explicitly provides, "A person with a disability may submit a request for a reasonable accommodation to maintain an assistance animal in a dwelling." KRS 383.085(2).

Because Ms. Dinter's evidence of discrimination is strong, and because the federal and state law are clear that Mr. Miremami's conduct constitutes unlawful

---

[3]    https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf

discrimination and that Ms. Dinter is entitled to the relief she seeks, Ms. Dinter is likely to succeed on the merits.

### C. Ms. Dinter will be irreparably harmed without preliminary relief.

Ms. Dinter will face irreparable harm without an emergency injunction. First, the loss of housing is a harm that cannot fully be restored by monetary damages. Second, if the Court does not act quickly, its ability to prevent future harm will be limited due to the Anti-Injunction Act's limitations on enjoining state proceedings.

### 1. Ms. Dinter will suffer irreparable harm if she is forced to leave her home.

The primary source of irreparable harm to Ms. Dinter is that her landlord is seeking to remove her from her home for unlawful reasons. If he is successful in an eviction action against Ms. Dinter, then she will be removed from her home based on discrimination. It is clear that a forcible detainer action against Ms. Dinter is imminent because he has given her a notice to vacate stating precisely this threat. *Exhibit 6* ("Failure to vacate premises may result in legal action."). Additionally, Ms. Dinter has not secured separate housing of her own where she could move if she is forced to leave. *Affidavit of Bridgett Dinter* at 4 ("I do not currently have another place of my own to stay if I am forced to leave my home."). As even the property manager stated, "It's hard to find places right now, it really is." Ex. 7 at 2:00.

As other courts have recognized, it "is well-established that the loss of an interest in real property constitutes an irreparable harm." *Park Village Apartment Tenants Association v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011). In addition, "[d]iscrimination in housing, when proved, almost always results in

9

irreparable injury." *Gresham v. Windrush Partners*, 730 F.2d 1417, 1424 (11th Cir. 1984). Other courts in this circuit have also found irreparable harm where a tenant faces eviction. *See Watkins v. Greene Metropolitan Housing Authority*, 397 F. Supp. 3d 1103, 1109–10 (S.D. Ohio 2019); *Smith v. State Farm Fire & Casualty Co.*, 737 F. Supp. 2d 702, 714 (E.D. Mich. 2010); *Young v. Maryville Housing Authority*, No. 3:09-cv-37, 2009 WL 2043891, at *9 (E.D. Tenn. July 2, 2009).

Accordingly, Ms. Dinter and her son would face irreparable harm without injunction relief.

## 2. The Plaintiff will suffer irreparable harm because the Court will no longer have authority to prevent the Defendant's unlawful conduct if it does not enjoin him from filing in state court.

Further, if the Court does not act soon, it may not be able to act later. "The primary justification for applying [the preliminary injunction] remedy is to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.*, 573 F. 2d 921, 925 (6th Cir. 1978) (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). The Anti-Injunction Act could prevent the Court from protecting Ms. Dinter's federally guaranteed rights if it does not do so through preliminary injunctive relief.

28 U.S.C. § 2283 says that "[a] court of the United States may not grant an injunction to stay proceedings in a State court." This means that, once state court proceedings have begun, the Anti-Injunction Act creates "an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions." *Martingale LLC v. City of Louisville*, 361

F.3d 297, 302 (6th Cir. 2004) (quoting *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286–87 (1970)). The Fair Housing Act's provisions for injunctive relief have been held to not fit within any of these exceptions. *See e.g. Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*, 988 F.2d 252, 261 (1st Cir. 1993).

Because Ms. Dinter will suffer irreparable injury if the Mr. Miremami is permitted to continue his violation of her rights, and because this Court could effectively lose its "ability to render a meaningful decision on the merits" if a forcible detainer action is filed in state court, Ms. Dinter will likely be irreparably harmed without the preliminary relief she seeks.

### D. A Temporary Restraining Order would not substantially injure the Defendant.

The potential harms to Ms. Dinter significantly outweigh any potential for harm to the Defendant by virtue of the requested order. The Defendant will still be entitled to his rent from Ms. Dinter, so any limit that such on order would place on his use of the property would be with appropriate compensation. Therefore, in consideration of the balance of equities, the Court should not hesitate to enter a Temporary Restraining Order to prevent an unlawful eviction.

### E. The Public Interest would be served by granting a Temporary Restraining Order.

Granting a Temporary Restraining Order serves the public interest because it would uphold Congress's intent, expressed in 42 U.S.C. § 3613(c)(1), in authorizing injunctive relief for victims of housing discrimination. "[T]here is a significant public

11

interest in eliminating discrimination against individuals with disabilities" and "such public interest is advanced by issuing an injunction." *Thomas v. Davidson Academy*, 846 F. Supp. 611, 620 (M.D. Tenn. 1994). Because the purpose of the Fair Housing Act is to ensure equal housing opportunities to persons with disabilities, and because a Temporary Restraining Order would advance this purpose, the Court should find that a Temporary Restraining Order and Preliminary Injunction would serve the public interest.

### F.  Ms. Dinter should be exempted from the bond requirement.

Ms. Dinter should be exempted from the bond required by Fed. R. Civ. P. 65(c). The amount to require in security, and even whether to require a bond is within the discretion of the Court. *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (holding that "the district court possesses discretion over whether to require the posting of security"). The Court should use its discretion to exempt her from the bond requirement because Ms. Dinter is pursuing this action *in forma pauperis* and could not afford to post what may be a significant bond amount, if the Court were to require one. It would be inequitable to require her to post a bond as it could prevent her from obtaining the relief that she would be entitled to under federal and state statutes. Furthermore, the Defendant's interests remain adequately protected by virtue of the fact that he is still entitled to the rent for however long Ms. Dinter continues to reside on the premises. A bond would not appear to be necessary under such circumstances. For these reasons, the Plaintiff respectfully requests that the Court waive the bond under Fed. R. Civ. P. 65(c). Other courts have properly

waived bonds for other tenants obtaining injunctive relief for federal housing violations. *See, e.g., Alms Residents Association v. HUD*, No. 1:17-cv-605, 2017 WL 4553401, at *14 (S.D. Ohio Oct. 12, 2017); *Cheatham v. Donovan*, No. 07-cv-13168, 2009 WL 2922150, at *11 (E.D. Mich. Sept. 8, 2009).

## CONCLUSION

For the reasons stated above, the Plaintiff's Motion for Temporary Restraining Order should be granted immediately and once the Defendant is served the Motion for Preliminary Injunction should be heard "at the earliest possible time." Fed. R. Civ. P. 65(b)(3).

Respectfully submitted,

/s/ James Fahringer

JAMES FAHRINGER (Ky. #97877)
APPALRED LEGAL AID
108 College St.
Somerset, KY 42501
(606) 679-7313 ext. 7208
jamesf@ardfky.org

/s/ Evan B. Smith

EVAN B. SMITH (Ky. #95243)
APPALRED LEGAL AID
120 N. Front Ave.
Prestonsburg, KY 41653
(606) 889-1958
evans@ardfky.org

## CERTIFICATE OF EFFORTS

As the undersigned attorney for the Plaintiff, in compliance with Fed. R. Civ. P. 65(b)(1)(B), I hereby certify that I have called the phone number listed for Mr. Miremami on the Notice of Non-renewal (*Exhibit 2*) and the Notice to Vacate (*Exhibit 6*), to attempt to resolve this matter without the present motion. To the best of my knowledge, this phone number is the correct contact number for matters relating to Mr. Miremami's rentals. I attempted to call this number twice. I was not able to reach anyone on the first attempt and left a message asking to resolve the issues with the service dog and the non-renewal of the lease. On the second call, I reached Mr.

13

Miremami's property manager. She refused my request to renew the lease. The requested Temporary Restraining Order is necessary to give Ms. Dinter her "day in court" so that she can present her evidence of the discriminatory intent behind the non-renew of her lease. Such evidence includes a recording of the property manager declining  the request for a service dog, and Ms. Dinter's affidavit that the property manager told her that Mr. Miremami was refusing to renew the lease based on her request for a service dog. Because the Notice to Vacate (*Exhibit 6*) could otherwise allow Mr. Miremami to file an eviction action within a few days, a Temporary Restraining Order without prior notice to Mr. Miremami is needed in order to maintain the status quo and "to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

/s/James Fahringer
JAMES FAHRINGER
*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this 8th day of September 2022, this document and its attachments were served on the currently unrepresented party via USPS First Class mail to:

Rok Miremami
116 Amcon Drive
Somerset, KY  42501

/s/  Evan B. Smith
EVAN B. SMITH
*Attorney for the Plaintiff*